Filed 1/23/24  Romero v. Brocca CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CESAR ROMERO et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> VICTOR DANIEL BROCCA et al., <br><br> Defendants and Respondents. | B316715 <br> (Los Angeles County <br> Super. Ct. No. BC590284) |
| CESAR ROMERO et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> VICTOR DANIEL BROCCA et al., <br><br> Defendants and Appellants. | B320296 <br> (Los Angeles County <br> Super. Ct. No. BC590284) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Holly J. Fujie, Judge.  Affirmed.

Cesar Romero, in pro. per., for Plaintiff and Appellant (B316715 and B320296).

Tatiana Romero, in pro. per., for Plaintiff and Appellant (B316715 and B320296).

Burton V. McCullough for Defendants and Respondents (B316715)/Defendants and Appellants (B320296).

————————————

Cesar Romero and Tatiana Romero (the Romeros) contracted with Victor Daniel Brocca, who operates a carpentry business under the name of Brocca Custom Finish Carpentry (BCFC), for carpentry work in connection with a residential remodeling project.[1] The Romeros subsequently terminated the contract and sued Victor, Victor's wife Ida Brocca,[2] and Victor's son-in-law Jerry Guzman (collectively, defendants). The Romeros sought damages, disgorgement of sums paid under the contract, and other relief.

Victor filed a cross-complaint against the Romeros for breach of contract and torts arising from the Romeros' termination of their contract.

The Romeros moved for summary judgment on Victor's cross-complaint, which the court granted. Although Victor held

---

[1] Some of the pleadings in the underlying case refer to Brocca Custom Finish Carpentry, Inc., a corporation. During trial, the court accepted the parties' stipulation that the correct name of the contracting party is "Victor Daniel Brocca dba Brocca Custom Finish Carpentry."

[2] Because plaintiffs Cesar and Tatiana Romero share a last name and defendants Victor Brocca and Ida Brocca share a last name, we will refer to them by their first names to avoid confusion. No disrespect is intended.

a contractor's license while he and his employees performed work for the Romeros, the court found that his failure to have workers' compensation insurance for the employees during that time resulted in the suspension of his license. (See Bus. & Prof. Code, § 7125.2, subd. (a)(2).) He could not, therefore, recover on his claims.

The Romeros' claims were tried to the court, which found in favor of defendants on the contract and tort causes of action. On a cause of action for disgorgement of money paid under the contract, the court found that the suspension of Victor's contractor's license entitled the Romeros "to a refund of the $6,500 paid by them under the contract, plus applicable prejudgment interest." (Capitalization omitted.) The court calculated the interest on the refund based on a 7 percent interest rate and determined that the defendants had repaid all amounts owed to the Romeros prior to trial. Consequently, the Romeros were "not entitled to any restitution."

The court initially determined that no one was a prevailing party. Later, the court granted in part the Romeros' motion to set aside the judgment and ruled that the Romeros were "the prevailing party in this action due to their partial monetary recovery prior to the trial."

The Romeros filed a memorandum of costs seeking $41,487.20. Defendants moved to strike the memorandum of costs, which the court treated as a motion to tax costs, and for sanctions against the Romeros. The court granted the motion to tax costs, declined to award any costs to the Romeros, and denied the defendants' motion for sanctions.

The Romeros appeal from the judgment (appeal No. B316715) and from the order granting the motion to tax costs (appeal No. B320296). The defendants cross-appeal (appeal No. B320296)

3

from the order denying their motion for sanctions. We consolidated the appeals for purposes of argument and decision.

In appeal No. B316715, the Romeros contend the court erred by: (1) Applying 7 percent prejudgment interest, instead of 10 percent, and in calculating the amount of restitution; (2) Concluding that the Romeros failed to prove breach of contract; (3) Finding that defendants owed no duty under tort law to the Romeros; (4) Concluding that the Romeros failed to prove negligent misrepresentation; (5) Preemptively denying the Romeros' attorney fees in the statement of decision; and (6) Failing to award treble damages under Code of Civil Procedure section 1029.8.[3]

In appeal No. B320296, the Romeros contend that the court erred in denying them the recovery of any costs. The Broccas, in their cross-appeal, contend that they are the prevailing parties and the court erred in denying their motion for sanctions.

We affirm the judgment and the orders from which the appeals are taken.

## FACTUAL AND PROCEDURAL SUMMARY

### A. *Factual Summary*

On August 5, 2014, the Romeros signed a written "Woodworks Agreement," which we will refer to as the contract. The ostensible counterparty is "Brocca Custom Finish Carpentry" (BCFC), a fictitious business name used by Victor.[4] On August 15, 2014,

---

[3] Unless otherwise indicated, subsequent statutory references are to the Code of Civil Procedure.

[4] BCFC is not a distinct legal entity and, as such, cannot hold a contractor's license. (See *Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1450; *Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694, 701.) It is a fictitious business name

4

Guzman signed the document on behalf of BCFC.  The parties do not dispute that Guzman's signature bound Victor under the contract.

According to the contract, BCFC agreed to fabricate and install kitchen cabinets, a first-floor bathroom vanity, a master bathroom vanity, and doorway casings, and perform other carpentry work in connection with a home remodeling project for the Romeros. Among other specifications, the contract required the vanities have U-shaped drawers under the sinks.  Victor's work on the project was to "be completed within 55 days . . . upon receiving down payment provided that [the] site project is in safe and workable conditions and the cabinets are not in risk of being damaged by other contractors or foreign persons not from [BCFC]."  The down payment of $9,500 "is required in order to officially start" work on the project.  An additional $2,400 is due upon the completion of certain work, and $5,000 is due upon the completion of other specified work.  A final payment of $7,013 is "due upon final installation of cabinets and hardware and verification [that the] project is working correctly."

The Romeros paid Victor $4,000 on August 21, 2014, and $2,500 on August 28, 2014, entirely by credit card.  They did not pay any additional sums toward the down payment or the contract price.

The parties agreed that BCFC would install the bathroom vanities before beginning work on the kitchen cabinets.  In September and October 2014, the Romeros and Guzman exchanged numerous emails regarding the color and design of the vanities.

---

associated with Victor's former contractor's license.  Nevertheless, we, like the parties and the trial court, will refer to BCFC at times as a shorthand way of referring to Victor's carpentry business.

Some of the emails from Guzman included reminders to the Romeros that $3,000 of the deposit remained unpaid.

According to Guzman, BCFC's work on the Romeros' house could not begin until the Romeros chose colors, and work by other contractors was completed. On November 4, 2014, the Romeros informed Guzman that the work of other contractors on the second floor of the house had been completed and the house was "ready for casings, baseboards and moldings, in addition to the vanity." Although Guzman brought the vanity the next day, a pipe protruding from the wall prevented him from installing it. The vanity was also unacceptable to the Romeros because it lacked the U-shaped drawer specified in the contract. Guzman agreed to modify or rebuild the vanity and said it would be ready to install on November 15.

On November 10, 2014, Tatiana informed Guzman by email of the Romeros' "picks for the baseboard, crown molding and casing." Later that day, Guzman thanked Tatiana for that information and again reminded her of the need to pay the balance due on the deposit. Guzman also informed Tatiana that the individual who was working on the modification to the master vanity "quit," and the installation of the vanity would need be delayed one week to November 22.

Between November 10 and 14, 2014, the Romeros and Guzman exchanged further emails clarifying the design and materials to be used for baseboards, crown molding, and door casings.

On November 14, 2014, Victor was seriously injured when he fell off a ladder. He was hospitalized for a period of time and unable to work for a "couple month[s]." During his recovery, Guzman operated the carpentry business and Ida,

6

who ordinarily operated a cake baking business out of her home, also communicated with the Romeros about the project.

On November 15, 2014, Cesar sent an email to Guzman stating that he would look at baseboard options that day and email his decision. In the email, he also accused Guzman of "coming up with excuses and non[-]sense and not enough time properly managing anything with [the] project." Cesar said he would "cancel [the] contract" and expect BCFC to return all money previously paid if it takes "longer than next week to FINISH" the baseboards, door casings, and vanities.

The next morning, Guzman responded to Cesar: "If base chosen today and is in stock I will pick up Monday and casing and base installed Monday. Vanity is scheduled for Saturday [November 22] install."

On November 17, Ida arranged for workers whom Victor had hired to install door casings at the Romeros' residence. The next day, the Romeros sent Ida a photograph of an installed door casing. Ida responded to Tatiana: "[Victor] couldn't believe this!!! Terrible!!!" She told the Romeros that they would fix the problem.

On November 19, 2014, Cesar sent Ida a document described as an "addendum to the contract" (capitalization omitted), which stated that it "supersedes the original contract between BCFC and [the Romeros]." If accepted, the document would have made substantial changes to the contract terms, including a $2,750 reduction of the contract price, Victor's agreement to "comply with a strict timeline outlined by [the Romeros]," payment to the Romeros of $150 per day until the work is completed, and an additional "$2,000 discount for all of the issues, damages and expenses caused by BCFC." The proposed addendum stated: "Failure to agree to the following terms will immediately cancel current contract based on breach of contract and fraud caused by BCFC, its employees and

7

contractors; and BCFC will be liable to any and all moneys owed to [the Romeros] including but not limited to all expenses incurred while waiting for these services to be performed by BCFC."

On November 20, Ida spoke with the Romeros by telephone. According to the Romeros, Ida told them that "she would not do the kitchen cabinets." According to Ida, she spoke to the Romeros about how BCFC can "fix the problem," and said she would talk with Victor about what they will do. She denied telling the Romeros that she "did not want to do the kitchen cabinets."

On November 21, 2014, Cesar emailed Ida and Guzman stating that no response had been received to the proposed addendum and giving them "formal notice of [their] breach of contract." Cesar demanded $8,500—$2,000 more than the Romeros had paid to BCFC—plus $150 for each day they "delay in returning [the Romeros'] money."

On November 26, 2014, Cesar informed Guzman and Ida that if Cesar did not receive $8,500 by the end of that day, they would "now be liable for ALL costs and expenses [Cesar] incurred because of your breach and negligence since the start of [the] contract. This amounts to tens of thousands of dollars."

The Romeros thereafter falsely reported to their credit card issuer that the payments they had made to Victor were "unauthorized." As a result, the credit card company debited BCFC's bank account by $2,500. The Romeros asserted that they never received the corresponding credit.

During the time the contract was in effect, Victor had a contractor's license issued by the Contractors State License Board (CSLB), which with BCFC's name was associated. The CSLB issued the license based on Victor's certification that it had no employees and was therefore exempt from the requirement of having workers' compensation insurance.

In March 2015, the Romeros retained a private investigator to determine "how many employees [BCFC] has," and thereafter reported the results of the investigation to the CSLB. In April 2017, the CSLB issued a citation against Victor with respect to the Romeros' project for, among other violations, failing to provide and maintain workers' compensation insurance and for including in the contract a requirement that the Romeros make a down payment of more than $1,000. As a result, the CSLB suspended Victor's license effective November 20, 2017.

The Romeros eventually hired Ramon Gutierrez to complete the kitchen and bathroom cabinets and Luis Lopez to complete the casings, baseboards, crown moldings, and to refinish doors and stairs. The documentary evidence of this work consists of a receipt by Gutierrez dated May 26, 2015, for $37,000 "cash," and a receipt by Luis Lopez dated June 19, 2015 for $9,900 "cash." (Capitalization omitted.) The Romeros also introduced a written proposal dated April 6, 2015 to Tatiana for "new kitchen cabinets" prepared by Sawdust Ltd, for $22,148.

Regarding the Romeros' damages, Tatiana testified that, in addition to the partial down payment of $6,500 paid to Victor and the money paid to Gutierrez and Lopez, their damages included payments on their mortgage between August 2014 and May 2015, the cost of "having to stay in hotels" and "eat out every day because [they] didn't have a kitchen," attorney fees, and "legal costs." Tatiana and Cesar also sought compensation for the loss of their time in dealing with the litigation, which they estimated to be worth a combined $350,000.

## B. *Procedural History*

The Romeros commenced the underlying action in August 2015. In October 2016, the Romeros filed the operative second

9

amended complaint against defendants and others seeking disgorgement of sums paid to BCFC under Business and Professions Code section 7031, and other relief under contract, negligence, fraud, and negligence misrepresentation causes of action.[5]  The fraud and negligent misrepresentations causes of action were based on allegations that the defendants represented: (1) "that they had a legitimate and lawful carpentry shop that was properly registered, insured and protected with the [S]tate of California and in good standing with all regulatory boards"; and (2) that they "had fully qualified and legal workers working in their shop."

In their answer to the second amended complaint, the defendants asserted, among other affirmative defenses, that the Romeros failed to mitigate their damages.

In January 2017, Victor filed a first amended cross-complaint against the Romeros alleging contract and tort causes of action arising from the Romeros' termination of the contract and BCFC's work on the project.[6]  The Romeros moved for summary judgment on the cross-complaint on the ground that Victor could not maintain his causes of action because he was not a licensed contractor.  (See Bus. & Prof. Code, § 7031, subd. (a).)

---

[5] The Romeros named Brocca Custom Finishing Carpentry, Inc., Daniel V. Brocca, Aida Brocca, Jerry Guzman, Claudio Cruz, Victor Daniel Brocca as defendants.  By the time judgment was entered, it appears that the corporation and Claudio Cruz had been dismissed as parties and the names of other defendants corrected to be Victor Daniel Brocca, Ida Brocca, and Jerry Guzman.

[6] Brocca Custom Finish Carpentry, Inc., a California corporation, was named as a cross-defendant.  Victor later stated that the corporation was erroneously named as a cross-defendant.

10

On November 27, 2017, the trial court granted the Romeros' summary judgment motion. The court found that although Victor produced evidence that he had a contractor's license while the contract was in effect, he had employees but did not carry workers compensation insurance, as required by law. (See Bus. & Prof. Code, § 7125.2.) That failure, the court concluded, "results in the automatic suspension of [Victor's] license as a matter of law" and bars his action against the Romeros.

On June 5, 2018, following a mediation session, Victor delivered to the Romeros a check for $5,400, noting that it was a "payment on disputed claim." The amount of the check was intended to cover repayment of the Romeros' $4,000 partial down payment plus interest. The Romeros cashed the check.

The Romeros' causes of action were tried to the court during nine days in February and March 2021. Although it does not appear from our record that any party requested a statement of decision, the court issued a proposed statement of decision in June 2021. The Romeros filed objections, which the court overruled. The court issued its final statement of decision in July 2021.

### C.   *The Court's Statement of Decision*

In the court's final statement of decision, the court made the following findings and conclusions of law relevant to this appeal.

The court stated that it did not find the Romeros to be credible witnesses. This finding was based in part on the Romeros' demeanor and evasiveness while testifying, and in part on evidence indicating that the Romeros acted with a "vindictive and punitive motivation" toward the defendants, and "were often overreaching in their claims and their demands." The court found Victor's "testimony to be more credible than that of [the Romeros]."

11

Guzman's testimony "was not entirely credible, being at times self-serving and not supported by the exhibits or his prior discovery responses." Ida was generally "credible although often confusing and unclear."

The court rejected the Romeros' contention that the defendants did not perform their work on the contract in a timely and satisfactory manner. The court explained that the contract called for a 55-day schedule, which "was not to commence until the full down payment of $9,500 was made." The Romeros, however, "never paid the full $9,500." Therefore, "no schedule applied under the contract" and there was thus "no factual basis for [the Romeros'] delay claim." (Capitalization omitted.)

The court found that BCFC's "door casing work was not performed in a workmanlike manner" and "the upstairs master vanity was not as specified, both in lacking a U-Drawer and in its length and fitting around the pipe end." The defects, however, constituted "a minor curable, not a material[,] breach," which BCFC had offered to cure. Instead of responding to the offer, however, the Romeros "attempted to renegotiate and then terminated the contract." (Capitalization omitted.) To the extent the Romeros had been damaged by any breach, the court found that they "failed to prove the amount of such damage and failed to adequately mitigate those damages."

Regarding the Romeros' negligence cause of action, the court stated that the Romeros "established only the basis for a breach of contract or a statutory damages claim under [Business and Professions Code, section] 7031[, subdivision] (b)," which they had asserted under other causes of action, not the violation of "a duty independent of the contract arising from principles of tort law." The court thus rejected the negligence claim because it "is an attempt to recover in tort for a mere breach of contract."

12

Regarding the Romeros' statutory disgorgement cause of action, the court found that BCFC was "technically" an unlicensed contractor during the contract period and the Romeros were thus "entitled to a refund of the $6,500 paid by them under the contract, plus applicable prejudgment interest" at the rate of 7 percent. (Capitalization omitted.)  The court found that the Romeros received a $2,500 credit via a chargeback in January 2015.  After accounting for that credit and applying the 7 percent interest rate, the court calculated the amount due the Romeros as of June 5, 2018 to be $5,173.99.  The defendants' payment to the Romeros of $5,400 on that date thus amounted to an overpayment of $226.01.  Therefore, the Romeros were "not entitled to any restitution on their cause of action."

The court determined that the Romeros failed to prove their cause of action for negligent misrepresentation because they did not establish that the allegedly false representations were false when made or, if any were false when made, that the Romeros reasonably or actually relied on them.

The court rejected the Romeros' request, under section 1029.8, for an award of treble damages and attorney fees.[7]  Section 1029.8 authorizes such damages and fees when a person "causes injury or damage to another person as a result of providing goods or performing services for which a [contractor's] license is required." (§ 1029.8, subd. (a).)  The court denied the claim because the only physical damage the Romeros suffered was "the improperly-installed door casings," and they failed to prove "the amount

_____

[7] The Romeros did not request treble damages or attorney fees under section 1029.8 in their second amended complaint.  It appears from our record that the Romeros first sought such relief in the trial brief filed shortly before trial.

13

of any damages incurred as the result of defendants' work."
(Capitalization omitted.)

The court exercised its discretion in denying the Romeros' claim for attorney fees because: (1) the Romeros "massively over-litigated" the case and "continually overreached in their claims"; (2) the Romeros had previously received all money they were entitled to receive under their statutory cause of action; and (3) the Romeros, who represented themselves in the case, "failed to establish that they paid attorney's fees."

The court found that no one is a prevailing party and ruled that each party shall bear their own costs.

On September 16, 2021, the court entered judgment for defendants on the second amended complaint and judgment in favor of the Romeros on the cross-complaint.

### D. *Postjudgment Events*

On October 7, 2021, plaintiffs filed a motion for new trial and a motion to set aside/vacate the judgment. On November 4, 2021, the court denied the motion for new trial and granted in part the motion to set aside and vacate the judgment by modifying the judgment to reflect that the Romeros are the prevailing party because they received the $6,500, plus interest, on their statutory claim for disgorgement.

The Romeros timely appealed from the judgment on November 12, 2021.

On November 17, 2021, the Romeros filed a memorandum of costs requesting $41,487.20. The defendants filed a motion

14

to strike the memorandum of costs, which the court treated as a motion to tax costs, and a motion for sanctions.[8]

In granting the motion to tax costs, the court explained that it was exercising its discretion to deny costs because of "indicia that the [memorandum of costs] is grossly inflated with unreasonable and/or unrecoverable costs, the evidence that several of the claimed costs were never incurred and the proportion of [the Romeros'] total recovery from defendants before the trial compared to the amount sought in the [memorandum of costs]." (Capitalization omitted.)

The court denied the defendant's motion for sanctions because the motion "[did] not squarely address whether [challenged] costs were fraudulently claimed" and because "the court has granted the [motion to tax costs]." (Capitalization omitted.)

The Romeros timely appealed from the order granting the motion to tax costs, and the defendants timely cross-appealed from the order denying their motion for sanctions.

## DISCUSSION

### A.   *Prejudgment Interest on Disgorged Funds*

Under Business and Professions Code section 7031, subdivision (b), generally, "a person who utilizes the services of an unlicensed contractor may bring an action in any court of competent jurisdiction in this state to recover all compensation paid to the unlicensed contractor for performance of any act or contract." The "provision generally requires an unlicensed contractor to disgorge all the moneys paid to it by a project owner" and applies

---

[8] A motion to strike a memorandum of costs is directed at the entire cost bill; whereas a motion to tax costs challenges particular items or amounts. (Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2023) ¶ 17:517.) "But the terms are often used interchangeably." (*Ibid.*)

15

" 'regardless of the quality of the work or the reasons for the failure of licensure.' " (*San Francisco CDC LLC v. Webcor Construction L.P.* (2021) 62 Cal.App.5th 266, 277.)

Although Victor held a contractor's license while the contract with the Romeros was in effect, the court found that his failure to have workers compensation insurance rendered him an unlicensed contractor at that time. Based on this conclusion, the court found that the Romeros were entitled under Business and Professions Code section 7031, subdivision (b) to a refund of the $6,500 they had paid to Victor, "plus applicable prejudgment interest" at the rate of 7 percent. The Romeros contend that the applicable rate should be 10 percent. We disagree.

Generally, under Civil Code section 3287, subdivision (a), "[a] person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day." The parties do not dispute that the $6,500 Victor was obligated to return to the Romeros was "certain," and that the Romeros were thus entitled to prejudgment interest.

Under our state Constitution, "the default prejudgment interest rate [is] 7 percent, unless otherwise provided by statute." (*Soleimany v. Narimanzadeh* (2022) 78 Cal.App.5th 915, 924; see Cal. Const., art. 15, § 1 [unless the parties otherwise agree in writing, the "rate of interest . . . on accounts after demand . . . shall be 7 percent per annum"]; see also *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 573 ["[a]bsent a statutory provision specifically governing the type of claim at issue, the prejudgment interest rate is 7 percent"].) We have not been referred to a statute that specifies a different rate of interest applicable to

16

the disgorgement of funds under Business and Professions Code section 7031.

The Romeros argue that disgorgement under Business and Professions Code section 7031 is " 'fundamentally contractual in nature,' " and they are thus entitled to interest at the rate of 10 percent. The statutory basis for 10 percent prejudgment interest on contract claims is Civil Code section 3289, which specifies that rate applies "after a breach" of contract if the parties did not stipulate to a rate of interest in the contract. (Civ. Code, § 3289, subd. (b).) Here, the court determined that the Romeros failed to establish a breach of contract, a conclusion we affirm below. The only cause of action on which the Romeros prevailed is their statutory claim for disgorgement of money based on the suspension of Victor's contractor's license. Therefore, the 7 percent rate set forth in our Constitution, not the 10 percent rate applicable to breaches of contract, applies. Because the court applied the constitutionally established rate, it did not err.

The Romeros further contend that the court calculated the amount of interest erroneously. According to the Romeros, the court failed to calculate the interest that accrued for seven days on the $4,000 payment made on August 21, 2014. They are incorrect. In its statement of decision, the court included a detailed calculation showing how the initial $4,000 payment accrued interest of $0.77 per day between August 21, 2014, when the payment was made and August 28, 2014, when the Romeros paid the additional $2,500 payment. The seven days of interest amounted to $5.39. The court then calculated the interest that accrued after August 28, 2014, on the new principal balance of

17

$6,500 ($1.25 per day) and added the previously earned $5.39 to the total. We therefore reject the Romeros' argument.[9]

### B. *The Court's Finding that the Romeros Received $2,500 Chargeback*

The court's determination that the Romeros had received all they were due from the defendants prior to trial was based in part on the court's finding that the Romeros had received $2,500 from Victor via a chargeback process initiated by the Romeros. The Romeros contend that the court's finding is not supported by substantial evidence. We disagree.

The Romeros paid BCFC $2,500 toward the down payment with their American Express credit card in August 2014. After terminating the contract, the Romeros disputed the charge to the credit card issuer. Guzman testified that, as a result, in January 2015 the $2,500 was returned to the Romeros "via American Express chargeback." Guzman's testimony is supported by a January 9, 2015, email from a payment system operator informing Victor of the $2,500 chargeback to the Romeros' credit

---

[9] Victor argues that the start date for the accrual of interest should be the date the Romeros terminated the contract in November 2014, not the August 2014 dates when the payments were made. The defendant's argument is supported by the constitutional provision governing prejudgment interest, which establishes the 7 percent rate of interest "on accounts *after demand*." (Cal. Const., art. 15, § 1, italics added.) The Romeros did not make a demand for the return of their payments until they terminated the contract in November 2014. We need not determine the particular date from which prejudgment interest accrued, however, because regardless of whether the August 2014 payment dates or the November contract termination date are used, Victor overpaid his debt to the Romeros and the court's determination that no further restitution is owed is correct.

18

card account and a bank statement for BCFC showing a debit from the account in the amount of $2,525 on January 12, 2015.[10] Victor authenticated these documents during trial and testified that the chargeback to the Romeros was never reversed.[11] The court could reasonably infer from such evidence that the $2,500 debited from BCFC's bank account pursuant to the chargeback was ultimately credited to the Romeros' credit card account.

Although Cesar testified that he did not receive the chargeback credit, the court "did not find this testimony credible" "based on his demeanor and the other evidence." The court also relied on Evidence Code section 412, which provides: "If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust." In particular, the court noted that it had, prior to trial, "ordered the parties to submit evidence regarding the chargeback of the $2,500," including "credit card statements." The Romeros submitted some credit card statements, but none that covered transactions after December 2014, which would have shown whether they received the disputed credit to their account in January 2015.[12] When

---

[10] According to defendants, the additional $25 reflects a service fee related to the chargeback.

[11] The Romeros argue that the bank statement and email were unauthenticated and that they objected to them at trial. The documents, however, were admitted into evidence without objection.

[12] The Romeros submission of their credit card statements is discussed by the court during trial. Although the court's docket reflects the filing of a document titled, "plaintiffs' submission of additional evidence re[garding] credit card payments as ordered by court" (capitalization omitted), the Romeros did not include

19

asked whether the Romeros ever obtained the relevant credit card statements, Tatiana testified that Cesar "might know," and Cesar testified that he did not obtain them. Under these circumstances, the court's application of Evidence Code section 412 is appropriate.

Guzman's and Victor's testimony regarding the chargeback, the defendants' documentary evidence of the chargeback, and the failure of the Romeros to produce documents they could have obtained to support their claim provide sufficient evidence to support the court's finding that the Romeros "received a credit for the $2,500 payment on the contract." (Capitalization omitted.)

### C.    *Breach of Contract*

According to the Romeros' second amended complaint, the defendants breached the contract "by failing, and continuing to fail, to produce any work. Defendants continued to come up with excuses and ignored [the Romeros'] calls, emails and other attempts at communication with defendants. To this day, the defendants failed to provide <u>any</u> work as agreed in contract." (Capitalization omitted.) In the statement of decision, the court stated that the Romeros failed to prove that the defendants "did not 'produce any work' "; "defendants did in fact produce work on the project, including the two bathroom vanities and the unsatisfactory door casings." (Capitalization omitted.) The Romeros do not dispute this finding.

The court proceeded to consider two other grounds for breach of contract the Romeros asserted during trial: The work the defendants performed was untimely because it was not finished

---

this document in the appellate record. Nor did the Romeros include in our record the bank statement submitted by the defendants showing the $2,500 debit.

20

within 55 days, and that the work on the vanities and door casings was unsatisfactory.

As to timeliness, the court found that the 55-day period for completing BCFC's work had not commenced because the contract provided that the period begins when the $9,500 down payment is received, and the Romeros never paid more than $6,500. Therefore, "no schedule applied under the contract" (capitalization omitted), and there was "no factual basis for [the Romeros'] delay claim arising therefrom." Even if the down payment requirement is excused, the court explained, the Romeros "did not provide evidence at trial as to how they calculated the 55-day schedule based upon the contract language." (Capitalization omitted.)

The Romeros do not dispute that they never paid the full down payment, but contend that the down payment requirement is unlawful and should not be enforced. They rely on Business and Professions Code section 7159, which requires that, if a down payment is required for a "home improvement" project, the contract shall state that the down payment "may not exceed $1,000 or 10 percent of the contract price, whichever is less." (Bus. & Prof. Code, § 7159, subd. (d)(8)(C), capitalization omitted.) Failure to include such language in a contract "is cause for discipline" (Bus. & Prof. Code, §§ 7159, subd. (a)(5), 7159.5, subd. (a)), and a misdemeanor (Bus. & Prof. Code, § 7159.5, subd. (b)).

Even if we assume that the $9,500 down payment requirement was illegal and that such illegality excused the Romeros from performing the down payment condition to BCFC's obligation to commence work, the commencement of BCFC's work was further conditioned on the project site being in a "safe and workable condition[ ] and the cabinets [not being at] risk of being damaged by other contractors or foreign persons not from [BCFC]." The evidence shows that other contractors were working on the

21

project site, and that the Romeros were not prepared to have BCFC install the vanities and door casings until November.  It was not until November 4, 2014, that Cesar informed Guzman that work by others on "the second floor of the house is completely done and [it is] ready for casings, baseboards and moldings, in addition to the vanity."  Indeed, the Romeros did not make their initial selection of the design of their baseboards, casings, and crown molding until November 10, less than two weeks before terminating the contract.  Therefore, even if the Romeros had alleged breach of contract based on delay, and regardless of whether the down payment condition to the commencement of the 55-day period is excused, there is no substantial evidence to support a breach of contract based on delay in performance.

As for whether BCFC breached the contract based on the nature and quality of their work, the court found that "the door casing work was not performed in a workmanlike manner" and that "the upstairs master vanity was not as specified, both in lacking a U-drawer and in its length and fitting around the pipe end."  (Capitalization omitted.)  These defects, however, amounted to "a minor curable [breach], not a material breach," and the Romeros refused the defendants' offer to cure the problems.  To the extent the Romeros were damaged, the court further found, they did not prove their breach of contract claim because they failed to prove the amount of their damages and failed to adequately mitigate their damages.  In particular, the court found the Romeros' testimony regarding damages and mitigation efforts "not credible," and noted the "lack of any documentary evidence that [the Romeros] made a timely search, or any search whatsoever for a substitute contractor, bids being obtained[,] or a contract being entered into" after they terminated the BCFC contract in November 2014.  Indeed, "the only document which purported to describe the

22

work" was a purported estimate from a company unrelated to the persons who supposedly did the work.

We need not address the issues concerning the materiality of the breaches or the legal significance of the Romeros' refusal to allow BCFC to cure the defective work because the Romeros do not challenge or address the court's finding on the affirmative defense that they failed to mitigate their damages.

"A plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided." (*Shaffer v. Debbas* (1993) 17 Cal.App.4th 33, 41.) On appeal, the Romeros abandon their reliance on the cash receipts from Gutierrez and Lopez as proof of damages. Instead, they point to their "mortgage expenses" of more than $24,500, "thousands of dollars in hotel stays," and undocumented and unspecified "expenses for having to eat out." Aside from issues as to whether such expenses would be recoverable at all for the alleged breaches (see Civ. Code, § 3300),[13] the Romeros present no argument challenging the court's failure-to-mitigate finding. They have thus failed to meet their burden on appeal of affirmatively establishing reversible error. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1658.)

The Romeros further contend that in November 2014, after Victor was injured and hospitalized, Ida informed the Romeros that "she would not do the kitchen cabinets"—a statement Ida denied

---

[13] "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515.)

23

making.  In their objections to the court's proposed statement of decision, the Romeros objected on the ground that the court failed to make a finding as to whether Ida's statement constituted an anticipatory breach of the contract.  The court did not address this point in the final statement of decision.  The Romeros argue that the absence of a finding on this point is reversible error.  We disagree.

In a statement of decision, a court must address " ' "principal controverted issues at trial as are listed in the request" ' " for a statement of decision.  (*Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150, 163.)  Here, the Romeros did not allege an anticipatory breach in the operative pleading, they did not raise the theory in their trial brief, and, so far as our record reveals, they did not request a statement of decision or seek a finding on the issue prior to the court's proposed statement of decision.  (See § 632 [party "shall specify those controverted issues as to which the party is requesting a statement of decision"]; Cal. Rules of Court, rule 3.1590(d) ["principal controverted issues must be specified in the request"].)  Even if we deemed their objection to the proposed statement of decision as a request for a finding on the issue of anticipatory breach, the issue cannot reasonably be considered a principal controverted issue at trial as it was not raised beforehand.  Even if it had been, the Romeros failed to demonstrate that the error requires reversal.  The only evidence to support the Romeros' assertion that Ida told them that "she would not do the kitchen cabinets" was the Romeros' testimony, which the court found lacking in credibility.  Ida, whom the court found more credible, disputed the Romeros' assertion.  It is not reasonably probable, therefore, that if the court had made the requested finding, it would have found in favor of the Romeros.  (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [reviewing court will reverse "only when the court,

24

'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

### D. *Negligence*

The Romeros contend that the court erred in rejecting their negligence cause of action when it found that defendants owed no duty to them independent of the obligations arising from the contract.

"[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 551.) Thus, "[t]ort damages have been permitted in contract cases where a breach of duty directly causes physical injury [citation]; for breach of the covenant of good faith and fair dealing in insurance contracts [citation]; for wrongful discharge in violation of fundamental public policy [citation]; or where the contract was fraudulently induced. [Citation.] In each of these cases, the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." (*Id.* at pp. 551–552.)

Here, the Romeros based their negligence cause of action on the same facts upon which they based their contract claim. They did not allege that defendants caused any physical injury to them or other facts that could give rise to an independent tort cause of action.

On appeal, the Romeros contend that the defendants owed to them "a duty to know the law and [the] principles of contracting business." (Boldface & capitalization omitted.) The defendants, for example, had a duty to know "that the $9,500 deposit was

25

illegal." Although charging such an "illegal" down payment may render the contractor subject to discipline and misdemeanor liability (Bus. & Prof. Code, § 7159.5, subd. (b)), nothing in the applicable statutes supports an independent tort action for the statutory violation.

Even if the statutory limitations on down payments establish a duty in tort not to impose a down payment requirement of more than $1,000, it appears that the only damages proximately caused by the breach of that duty would be the amount of the down payment that exceeds that limit. (See Civ. Code, § 3300 [tort damages limited to "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby"].) The Romeros, however, recovered their entire down payment prior to trial. Their negligence claim, if based on this alleged duty, thus fails.

### E.  *Negligent Misrepresentation*

In their third cause of action for fraud, the Romeros alleged that the defendants falsely and fraudulently represented to the Romeros "that they had a legitimate and lawful carpentry shop that was properly registered, insured and protected with the [S]tate of California and in good standing with all regulatory boards" and that they "had fully qualified and legal workers working in their shop located in Ontario[, California]." The same alleged misrepresentations are the basis for the Romeros' seventh cause of action for negligent misrepresentation.

In its statement of decision, the court rejected the fraud claims based on its findings that Victor, whose contractor's license was in effect during the time the contract was in effect, "had a reasonable basis for believing that the business was in fact 'properly registered' and 'in good standing with all regulatory boards.' Such

alleged representation was not proven to have been false at the time it was made because it was only later that [Victor's] license was suspended retroactively. The court also finds that [the Romeros] have failed to prove that defendants made a specific representation that defendants 'had a legitimate and lawful carpentry shop' or that BCFC was somehow 'protected with the [S]tate of California.' In any event, those purported statements are insufficiently certain and understandable statements of fact to support a fraud claim." (Capitalization omitted.)

Regarding the allegation that the defendants misrepresented that they had "fully qualified and legal workers," the court found that the Romeros failed to prove that the representation, if made, was false.

In addressing the Romeros' cause of action for negligent misrepresentation, the court referenced its earlier findings on the fraud cause of action and further stated that the Romeros failed to prove that the alleged representations, if made at all, were false when they were made, or that the Romeros "reasonably or actually relied upon" the representations.

On appeal, the Romeros do not challenge the court's finding as to representations concerning Victor's contractor's license. They assert, however, that the defendants "made representations that they were fully insured," and that this representation was not true. They point to a statement on a BCFC brochure given to the Romeros in 2014 stating that the business is "insured [and] bonded" (capitalization omitted), and to Victor's and Guzman's responses to interrogatories admitting that they did not have a policy of insurance in effect at the relevant time that would cover the Romeros' claims. The Romeros do not, however, point to any evidence that they relied on the misrepresentation of insurance; they state, without citation to the record, only that, if BCFC had

27

insurance, they "could have made a claim to [defendants'] insurance company." This is not evidence of reliance. Nor do they point to any evidence in the record that the defendants did not have "fully qualified and legal workers" available to BCFC at the time they entered into the contract. The Romeros have thus failed to show that the court erred in finding that they failed to prove their negligent misrepresentation claim.

## F.    *Treble Damages and Attorney Fees*

The Romeros contend that the court erred in failing to award them treble damages under section 1029.8. Under that statute, "[a]ny unlicensed person who causes injury or damage to another person as a result of providing goods or performing services for which a license is required under [the Contractors License Law] shall be liable to the injured person for treble the amount of damages assessed in a civil action in any court having proper jurisdiction." (§ 1029.8, subd. (a).) Section 1029.8 also permits the court, "in its discretion, [to] award all costs and attorney's fees to the injured person if that person prevails in the action." (*Id.*, subd. (a).) For purposes of this statute, an "unlicensed person," does not include a person "providing goods or services under the good faith belief that [the person is] properly licensed and acting within the proper scope of that licensure." (*Id.*, subd. (d)(1).)

Initially, we note that, because section 1029.8 is penal in nature (see *Rony v. Costa* (2012) 210 Cal.App.4th 746, 757; *G.H.I.I. v. MTS, Inc.* (1983) 147 Cal.App.3d 256, 277), a plaintiff who seeks treble damages must "make a clear demand for the penalty" in the operative pleading. (34 Cal.Jur.3d (2023) Forfeitures and Penalties, § 36). And where, as here, the statute includes an exception to its application, "the plaintiff must show that the defendant does not come within it." (*Ibid.*) The Romeros did not make a demand

28

for treble damages or refer to section 1029.8 in their operative pleading. Nor did they seek a finding on the issue whether Victor acted under a good faith belief that he was properly licensed at the relevant time.[14]

Even if the claims asserted under section 1029.8 were properly before the trial court, the court did not err in rejecting them. As the court explained, the only damage to the Romeros' property was the improperly-installed door casings, for which the Romeros submitted no evidence of the cost of repair or replacement. The Romeros do not challenge this finding on appeal. There was thus no substantial evidence of an amount to be trebled.

The Romeros argue, however, that they should be entitled to recover treble the amount of the $6,500 they paid to Victor, up to the statutory maximum of $10,000. The partial down payment, they contend, is their "injury." They offer no authority for the proposition that down payments to a contractor can constitute "injury or damage to another person as a result of providing goods or performing services" or, if such payments could constitute "injury or damage" to them, that the payments, which were a prerequisite to the commencement of work, were "cause[d]" by the defendants' provision of goods or services. (§ 1029.8, subd. (a).) The text of the statute does not suggest the construction urged by the Romeros, and we decline to adopt it. The Romeros' claim for an award of discretionary attorney fees under section 1029.8 fails for the same reason.

The Romeros further contend that the court should not have decided the issue of attorney fees until after they filed a separate,

---

[14] Although the claims made under section 1029.8 appear to be fatally defective for these reasons, neither the trial court nor defendants relied on this point.

posttrial motion for such fees and the court held a hearing on the motion. Nothing in section 1029.8 requires a separately noticed motion before deciding whether to award attorney fees, however, and the Romeros offer no apposite authority to suggest otherwise.

## G. *Order Granting Defendants' Motion to Tax Costs*

The court granted the defendants' motion to tax costs in its entirety denying all of the Romeros' claimed costs. The Romeros contend that the court's ruling is error. We disagree.

Initially, we address an argument the defendants assert. In their motion to tax costs, the defendants argued that they, not the Romeros, are the prevailing parties—an argument they reassert on appeal. The trial court summarily rejected the argument because it had previously determined the Romeros had prevailed on their disgorgement cause of action "due to their partial monetary recovery prior to the trial." The Romeros argue that the defendants cannot challenge the court's prevailing party finding because that finding was part of the judgment, from which the defendants did not timely appeal.[15] The defendants, however, contend that the prevailing party issue was relitigated in connection with their motion to tax costs and can be challenged in their cross-appeal from the ruling granting their motion. Even if the defendants are correct as to the appealability and timeliness of their challenge, the court did not abuse its discretion in finding that the Romeros were the prevailing parties based on the defendants' pretrial payment to settle the statutory disgorgement cause of action. (See *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th

_____

[15] The Romeros filed a motion in this court in case No. B316715 to strike portions of the defendants' respondents' brief that asserted that defendants were the prevailing parties. We deny the motion.

1139, 1151 [plaintiff who receives payment to settle claim prior to trial is prevailing party]; see also *DeSaulles v. Community Hospital of Monterey Peninsula* (2016) 62 Cal.4th 1140, 1158 [plaintiff who receives monetary settlement from defendant in exchange for dismissal of action is the prevailing party].)

Turning to the Romeros' contentions, the court, in exercising its discretion to deny the Romeros' costs, relied on section 1033, subdivision (a), which provides that "[c]osts or any portion of claimed costs shall be as determined by the court in its discretion in a case other than a limited civil case in accordance with Section 1034 where the prevailing party recovers a judgment that could have been rendered in a limited civil case." The purposes of this statute are "to encourage plaintiffs to bring their actions as limited civil actions whenever it is reasonably practicable to do so" (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 988) and " 'to discourage plaintiffs from "over filing" their cases' and thereby 'wast[ing] judicial resources' " (*Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1053).

In exercising its discretion to deny the Romeros' costs, the court noted: (1) The Romeros sought costs in an amount that substantially exceeded their recovery, which they obtained prior to trial; (2) Several of the claimed costs are not recoverable as a matter of law, such as more than $7,500 in fees for experts not ordered by the court and fees for photocopies of documents other than trial exhibits (section 1033.5, subd. (b)(1) & (3)); (3) There are "several indicators that the claimed costs are overstated," citing, as examples, the Romeros' claims for the recovery of "filing fees for motions that do not appear to have ever been filed," and "filing fees [for] . . . filings that do not require filings fees"; (4) There is evidence that some claimed costs were never incurred; and (5) Approximately $4,000 of fees allegedly paid to a court reporter were never paid.

On this last point, the court stated that Cesar's testimony that he paid the court reporter "was unconvincing, inconsistent, uncorroborated[,] and lacked credibility." The court suggested a further reason for its exercise of discretion by citing to *Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734, which held that, in determining the amount of attorney fees to award a prevailing party, a court may consider whether the attorney "overlitigated the case." (*Id.* at p. 738.)

Here, the Romeros brought their action as an unlimited civil case and obtained no monetary recovery in the judgment. Indeed, the court found that Victor had overpaid the Romeros by $226. Even if the Romeros are deemed to have recovered the $6,500 they received from the defendants prior to trial as a result of their litigation, that recovery is far below the $25,000 jurisdictional minimum for unlimited civil actions. (See §§ 85, 88.)[16] The additional reasons the court gave for denying costs, set out above, are supported by the record and not meaningfully challenged by the Romeros. Indeed, it appears that the memorandum of costs is a reflection of the "overreaching" that the court attributed to the Romeros' prosecution of the underlying case generally. The court's ruling is not an abuse of discretion.

The Romeros contend that, even if the court had discretion as to costs related to the prosecution of their claims, the court did not have the discretion authorized under section 1033 with respect to their "cross-complaint costs to which [they] were entitled as a matter of right." They appear to argue that costs incurred in

---

[16] At the time the Romeros commenced the underlying action, the jurisdictional limit for limited civil cases was $25,000. (Former § 85.) As of January 1, 2024, the limit is $35,000. (Stats. 2023, ch. 861, § 2; Sen. Bill No. 71 (2023–2024 Reg. Sess.) § 2.)

32

defending against Victor's cross-complaint that can be separated from those incurred in prosecuting their own claims are recoverable because the court granted their mid-litigation motion for summary judgment on the cross-complaint. They refer us to cases that hold, generally, that a defendant or cross-defendant who prevails by virtue of the dismissal of the complaint or cross-complaint is a prevailing party entitled to costs. (See, e.g., *Brown v. Desert Christian Center* (2011) 193 Cal.App.4th 733, 738; *City of Long Beach v. Stevedoring Services of America* (2007) 157 Cal.App.4th 672, 679; *Crib Retaining Walls, Inc. v. NBS/Lowry, Inc.* (1996) 47 Cal.App.4th 886, 890; see also § 1032, subd. (a)(4) [prevailing party includes "a defendant in whose favor a dismissal is entered"].) None of the cited cases, however, involves the application of section 1033 or the factual situation presented here: The parties who seek to recover costs are both plaintiffs who filed an unlimited civil action and recovered less than the jurisdictional minimum for an unlimited civil action and cross-defendants who prevailed on the cross-complaint.

Even if section 1033 is construed as the Romeros contend, their memorandum of costs does not clearly distinguish between costs incurred prosecuting their action and costs incurred defending against Victor's cross-action, and their opposition to the motion to tax does not raise the argument they assert on appeal. Nor have they identified in their opening brief on appeal which costs are attributable solely to the defense of the cross-complaint. Neither the trial court nor this court is required to scour the memorandum of costs and the approximately 1,200 pages of supporting exhibits to determine sua sponte which costs were incurred in connection with the cross-complaint and which were incurred on the Romeros' action. (Cf. *Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149; *In re Podesto* (1976) 15 Cal.3d 921, 928, fn. 4.) Moreover,

33

in light of the court's findings as to Cesar's lack of credibility, the Romeros' misrepresentations as to certain claimed costs, and that other costs were "grossly inflated," "unreasonable," or "unrecoverable," the court did not err in rejecting the Romeros' claims in their entirety.

## H.    *The Defendants' Motion for Sanctions*

In response to the Romeros' memorandum of costs, the defendants filed a motion for sanctions under section 128.7, contending that the "costs claimed by [the Romeros] . . . are fraudulent and dishonest, unnecessary and unreasonable, and made in bad faith with a view to harass defendants and needlessly increase the costs of litigation." The defendants sought a monetary sanction of $41,487.20.

The court denied the motion on the ground that the defendants failed to address whether the Romeros "fraudulently claimed" the costs they sought to recover.

" 'We review a section 128.7 sanctions award under the abuse of discretion standard. [Citation.] We presume the trial court's order is correct and do not substitute our judgment for that of the trial court.' " (*Kumar v. Ramsey* (2021) 71 Cal.App.5th 1110, 1121 (*Kumar*).)

Section 128.7 "should be utilized only in 'the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose.' [Citation.] 'Because our adversary system requires that attorneys and litigants be provided substantial breathing room to develop and assert factual and legal arguments, [section 128.7] sanctions should not be routinely or easily awarded even for a claim that is arguably frivolous' [citation], and instead

34

'should be "made with restraint." ' " (*Kumar, supra,* 71 Cal.App.5th at p. 1121.)

As discussed above, the Romeros' memorandum of costs seeks the recovery of some expenses not allowable under the law and lacks evidentiary support for others.  Nevertheless, based on our review of the record, we conclude that the court did not abuse its discretion in determining that these and other defects in the memorandum of costs did not warrant the imposition of sanctions. We therefore affirm the order denying the defendants' motion.

## DISPOSITION

The judgment, the order granting the respondents' motion to tax costs, and the order denying the respondents' motion for sanctions are affirmed.

The respondents are awarded their costs on appeal in case No. B316715.  The parties shall bear their own costs on appeal in case No. B320296.

NOT TO BE PUBLISHED.


ROTHSCHILD, P. J.

We concur:



BENDIX, J.



WEINGART, J.